1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                        ---

4

5    THE HONORABLE STEPHEN V. WILSON, U.S. DISTRICT JUDGE PRESIDING

6

7    STAN LEE MEDIA, INC., etc.    )
     et al.,                       )
8                                  )
             Plaintiffs,           )
9                                  )
        vs.                        )   No.  CV 07-225-SVW
10                                 )        CV 07-4438-SVW
                                   )        CV 09-2340-SVW
11                                 )
     JAMES NESFIELD, etc., el.,    )
12                                 )
             Defendants.           )
13   _____)

14

15

16           REPORTER'S TRANSCRIPT OF PROCEEDINGS

17              LOS ANGELES, CALIFORNIA

18             MONDAY, JANUARY 24, 2011

19

20

21

22   _____

23              DEBORAH K. GACKLE, CSR, RPR
                United States Courthouse
24          312 North Spring Street, Room 402A
                Los Angeles, California 90012
25                   (213) 620-1149

1    **APPEARANCES OF COUNSEL:**

2

3              Jack G. Cairl
              Isaacman Kaufman & Painter PC
              10250 Constellation Boulevard, Suite 2900
4              Los Angeles, California  90067
              (310) 881-6800
5              Fax: (310) 881-6801
              Email: cairl@ikplaw.com
6

7

8              Robert E. Kohn
              Enenstein & Ribakoff APC
              233 Wilshire Boulevard Suite 900
9              Santa Monica, California  90403
              310-899-2070
10             Fax: 310-496-1930
              Email: rkohn@enensteinlaw.com
11

12             Luke McGrath
              Dunnington Bartholow & Miller LLP
13             1359 Broadway
              New York, New York  10018
14             212-682-8811
              Fax: 212-661-7769
15             Email: lmcgrath@dunnington.com

16

17             Leslie N. Werlin
              McGuireWoods
18             1800 Century Park East 8th Floor
              Los Angeles, California  90067
19             310-315-8200
              Fax: 310-315-8210
20             Email: lwerlin@mcguirewood.com

21

22             Marcy M. Heronimus
              Sherman and Howard LLC
23             633 Seventeenth Street Suite 3000
              Denver, Colorado  80202
24             303-297-2900
              Fax: 303-298-0940
25             Email: mheronimus@shermanhoward.com

```
 1        LOS ANGELES, CALIFORNIA; MONDAY, JANUARY 24, 2011; 1:40 P.M.

 2                              - - - - -

 3

 4            THE CLERK:  Item 8, CV 07-225, CV 07-4438, and

 5    CV 09-2340, QED Productions, LLC, et al. versus James Nesfield,

 6    et al.; and Stan Lee Media, Inc. versus Stan Lee, et al.; and

 7    Jose Abadin versus Stan Lee.

 8            Counsel, please state your appearance.

 9            MR. KOHN:  Good afternoon, Your Honor.  Robert Kohn

10    on behalf of Stan Lee Media, Inc., a Colorado corporation.

11            MR. McGRATH:  Luke McGrath of Dunnington, Bartholow

12    and Miller, also presenting the Colorado corporation, Stan Lee

13    Media, Inc.

14            MR. CAIRL:  Jack Cairl representing the derivative

15    plaintiff, Jose Abadin.

16            MS. HERONIMUS:  This is Marcy Heronimus on behalf of

17    Stan Lee, QED and Pow! Entertainment.

18            MR. WERLIN:  Good afternoon, Your Honor.  Leslie

19    Werlin, McGuire Wood, for the same parties.

20            THE COURT:  Who is Jack Cairl?

21            MR. CAIRL:  Right here, Your Honor.

22            THE COURT:  You represent who?

23            MR. CAIRL:  The derivative plaintiff.

24            THE COURT:  Be seated for a moment because this has

25    become -- and not just today, but over time -- an unbelievable
```

 1    mess.  I mean it almost is an embarrassment.  I'm not saying

 2    that in a manner to impugn anyone's integrity, but through one

 3    decision or another, the case has become so entangled that it

 4    raises more questions than are easily answerable; and what it

 5    doesn't come close to doing is addressing what otherwise would

 6    be a rather straightforward dispute.  To me, the dispute, which

 7    has been absolutely lost in the shuffle, is whether Stan Lee

 8    had a right to breach the -- not breach -- but void the

 9    contract with SLMI -- as he says he did -- shortly before the

10    SLMI bankruptcy or, alternatively, whether the contract between

11    Stan Lee and SLMI was voidable at the outset and because the

12    essential dispute is who has the copyrights to the creations of

13    Stan Lee.

14            Somehow -- and this is not fully understood to this

15    court -- Stan Lee transferred copyright interests at some time

16    shortly after this contract was entered into between Stan Lee

17    and SLMI to Marvel Comics, and there has been a judgment in

18    that case in the federal court in New York, and I don't know

19    the specifics of it, but it appears that the judgment awarded

20    some copyright interest to Stan Lee and some to Marvel Comics.

21            The question arises:  How could Stan Lee transfer

22    copyright interest to Marvel Comics a year or so after he had

23    supposedly transferred his copyright interest to SLMI?

24            I suppose it is possible if there's some explanation

25    that only some copyright interests were transferred to SLMI and

1    those that weren't transferred were then transferred or

2    assigned to Marvel.  I don't know the answer to that at the

3    moment.

4              But the case began, at least in this court, with a

5    derivative action by someone named Abadin -- is that the name,

6    Abadin? -- and maybe there was -- and then there was sort of a

7    parallel case, but essentially involving the same dispute about

8    the copyright holder differences between SLMI and Stan Lee.

9              So Abadin sues on behalf of SLMI, and then there was

10   a lawsuit by QED -- which is essentially Stan Lee -- against

11   someone named Nesfield, and those lawsuits ran into procedural

12   problems because SLMI had not kept up its status as a

13   corporation in Colorado and so it wasn't in a position to be

14   heard.  That since has been remedied.

15             QED was not in a position to be a plaintiff because

16   SLMI, when it was in bankruptcy, was ordered to transfer the

17   copyright interests it had, those interests that were in

18   dispute with Stan Lee, to another company called SLC.  As a

19   prior order of this court shows, that never happened somehow,

20   and the copyright interests were transferred to QED.

21             And my assumption is that when the bankruptcy court

22   involving SLMI allowed the transfer of the copyright interests

23   at play to SLC, it did that understanding that there was a

24   dispute between SLMI and Stan Lee but thought that for the

25   benefit of the bankruptcy estate, that transfer ought to be

 1  made to better develop the copyright asset.

 2          In the cases in New York, there is the dispute

 3  between Stan Lee and Marvel, which I'll call the -- just for

 4  sake of convenience -- the Judge Sweet case, and then there is

 5  the derivative action that was dismissed by Judge Crotty --

 6  call that the Judge Crotty  case -- and that case was dismissed

 7  because the derivative action representative was unqualified by

 8  virtue of not having stock at the time of the events alleged in

 9  the complaint.  And there's a collateral issue here surrounding

10  whether Judge Crotty's decision about the merits has some res

11  judicata effect.

12          I want to address two things -- and not to limit

13  discussion as to others -- but two things that concern me more

14  than others.  Everything concerns me because it's a gigantic

15  mess.  Just my recitation here ought to allow that conclusion,

16  and it's a mess in large part because of the derivative

17  plaintiffs.  I mean some time ago, they just whaled away and

18  filed lawsuits everywhere.  The result is that some courts were

19  ahead of other courts, some decisions were made that arguably

20  impact other cases, perhaps not, and instead of addressing, as

21  I said at the outset, what is the seminal issue or issues,

22  we're here trying to untangle a web of procedural questions,

23  some of which seem difficult.

24          But the first question I want to address is this --

25  the Marvel litigation, the Judge Sweet litigation.  What is the

1    effect of that judgment with regard to the derivative

2    plaintiffs and/or Stan Lee's rights to any of those copyrights?

3    Is it the same bundle of copyrights that Judge Sweet

4    adjudicated between Marvel and Stan Lee?  When I say "Stan

5    Lee," I mean Stan Lee the author, or was it something else?

6              Will somebody address that issue.

7              MR. McGRATH:  Luke McGrath for --

8              THE COURT:  Take the lectern.

9              Who is your client?

10             MR. McGRATH:  I represent Stan Lee Media, Inc.

11             THE COURT:  So SLMI.

12             MR. McGRATH:  Yes, that's correct.

13             THE COURT:  But you're opposing the stay, correct?

14             MR. McGRATH:  We are opposing an extension of the

15   stay or a new stay.

16             THE COURT:  In other words, your position is you

17   would like the -- one of the cases before this court to go

18   forward.

19             MR. McGRATH:  At least one, if not all three, and we

20   would be willing to proceed in any order that the court seems

21   appropriate, including addressing the issue that you've raised,

22   which is --

23             THE COURT:  But right now the case -- maybe I'm

24   getting ahead of myself.  Let me turn back to that.  But let me

25   first get your position on the effect, if any, of the Marvel

8

```
 1   Judge Sweet case.
 2              MR. McGRATH:  Yes, Your Honor.
 3              We believe that the effect of that case --
 4              THE COURT:  By the way, you are moving to intervene
 5   in this case as we speak, correct?
 6              MR. McGRATH:  Yes.
 7              THE COURT:  Judge Sweet has not made a ruling in that
 8   regard.
 9              MR. McGRATH:  That is correct.
10              THE COURT:  Why are you moving to intervene in that
11   case?
12              MR. McGRATH:  Your Honor, we, in a way, are very
13   similar to you, recently are new on the scene.  You've had more
14   history on this case than the current duly authorized
15   representatives of SLMI because the Colorado courts have just
16   recently authorized SLMI's board to act on behalf of the
17   company in the best interest of the shareholders.
18              What we did is we surveyed the litigation record and
19   wreckage of the last -- close to 10 years and determined that
20   we had to take decisive action in order to protect the
21   interests of SLMI and SLMI shareholders.  One of those actions
22   we took -- and it was an action in order to void Judge Sweet's
23   judgment -- was to appear before Judge Sweet.  We wanted to get
24   access to records --
25              THE COURT:  One moment.  Before you get into details,
```

```
 1    let's not get too detailed until we have the big picture.

 2              MR. McGRATH:  Sure.

 3              THE COURT:  So the fact that you intervened informs

 4    me that you must have felt that that judgment affected SLMI.

 5              MR. McGRATH:  Arguably could affect SLMI, correct.

 6              THE COURT:  But otherwise you wouldn't intervene.

 7              MR. McGRATH:  Correct.

 8              THE COURT:  In other words, why haven't you

 9    intervened, and how do you believe the Stan Lee/Marvel

10    judgment, the Judge Sweet case, affects SLMI?

11              MR. McGRATH:  Before Judge Sweet, Lee presented a

12    complaint that said that he owned the characters that were in

13    dispute between him and Marvel.  We'll call it the Marvel

14    characters, although we don't concede they ever belonged to

15    Marvel but just for ease of reference.  The paragraphs 13 and

16    14 of Lee's complaint said, I, Stan Lee, own these characters,

17    and I gave Marvel a conditional assignment in order for Marvel

18    to exploit these characters and pay me.  Our position, based

19    upon the earlier assignment to SLMI of -- we would argue -- the

20    same intellectual property is that Lee did not tell Judge Sweet

21    this, but Lee basically was asserting rights in characters as

22    if he owned them when, in fact, he had previously

23    transferred --

24              THE COURT:  Simply stated, your position is that Stan

25    Lee's agreement with SLMI in 1998 encompassed the so-called
```

1    conditional rights that he gave to Marvel, correct?

2              MR. McGRATH:  And the Marvel characters, exactly.

3              THE COURT:  But the agreement between SLMI and Stan

4    Lee involved more than the Marvel characters, didn't it?

5              MR. McGRATH:  Correct.

6              THE COURT:  Marvel was just a subset of all the

7    copyright interests.

8              MR. McGRATH:  Exactly.

9              THE COURT:  So even if SLMI was barred from upsetting

10   the judgment in the Judge Sweet litigation, as regards those

11   Marvel interests, you would still be asserting a number of

12   other copyright interests by virtue of the Stan Lee/SLMI

13   contract?

14             MR. McGRATH:  Certainly.

15             THE COURT:  And in order to intervene in the case in

16   New York, the case is closed, correct?

17             MR. McGRATH:  It is --

18             THE COURT:  And a judgment has been rendered.

19             MR. McGRATH:  That is correct --

20             THE COURT:  You can't intervene in a closed case.

21   Somehow you have to reopen the judgment, correct?

22             MR. McGRATH:  Correct --

23             THE COURT:  Is that what you're doing?

24             MR. McGRATH:  Under Rule 60(b), that is exactly what

25   we're doing, Your Honor.

1          THE COURT:  So what is the ground?  Some kind of

2  fraud on the court?

3          MR. McGRATH:  There's basically multiple grounds but

4  fraud on the court is one of them because Stan Lee -- neither

5  Stan Lee nor Marvel told Judge Sweet, Hey, there is this other

6  assignment to SLMI, and by the way, SLMI is in bankruptcy.  So

7  anything you do, Judge Sweet, is going to be void because we're

8  not allowed to bring this case or controversy before you --

9          THE COURT:  To what extent are the characters that

10  were the subject of the assignment in the Judge Sweet case a

11  part of the package of copyright interests as a whole?

12          MR. McGRATH:  Copyright interests of SLMI?

13          THE COURT:  Yes.

14          MR. McGRATH:  They would be -- percentage -- roughly

15  80 percent at that time.

16          THE COURT:  Eight or 80?

17          MR. McGRATH:  Eighty.

18          THE COURT:  8-0?

19          MR. McGRATH:  8-0.  Because Lee had the Marvel

20  characters --

21          THE COURT:  The marvel characters are -- for lack of

22  a better term -- the centerpiece of the litigation.

23          MR. McGRATH:  Your Honor, in 1998 and going forward,

24  yes, but then Stan Lee has done other things since, and then

25  the Stan Lee name and brand and likeness are also a major part

1    of the focus of this litigation.

2            THE COURT:  So in other words, you claim by virtue of

3    the 1998 SLMI Stan Lee contract, the rights to all of Stan

4    Lee's creations in the future.

5            MR. McGRATH:  That he created in the past and in the

6    future, that's correct.  That is the exact language of this

7    assignment sign.

8            THE COURT:  But the creations in the past, as of the

9    time of the contract -- when I refer to "the contract," I'm

10   referring to the SLMI contract -- the past creations were

11   largely the Marvel creations.

12           MR. McGRATH:  That is correct.  I think it would be

13   disingenuous to argue that they're not valuable:  Spiderman,

14   Iron Man, hugely valuable franchises.

15           THE COURT:  But in terms of value, would those

16   interests, those copyrights, the Marvel Spiderman and others

17   that you mentioned, still be, from a dollar standpoint,

18   predominant in terms of the actual revenue that the parties are

19   arguing about, or would it be as much Stan Lee's creations more

20   recently?

21           MR. McGRATH:  I think -- the honest answer to that is

22   if you did the accounting today, it would be the Iron Man, the

23   Spiderman franchise, the Marvel-type characters.  I think that

24   is the only way to answer that.

25           THE COURT:  Okay.  This gets me closer to the point.

13

1          What relief are you actually striving for in the New

2    York litigation, in the Judge Sweet case?  What do you want

3    Judge Sweet to do?

4          MR. McGRATH:  What we'd like Judge Sweet to do and

5    what he is going to do are two different things, but I'll tell

6    you what we want him to do.

7          THE COURT:  I only asked what you're seeking --

8          MR. McGRATH:  We're seeking for him to reopen the

9    case under Rule 60(b); then we're asking him to realign SLMI as

10   a plaintiff in that matter and assert the same -- or actually

11   similar -- because they're slightly different -- but similar

12   rights that we asserted against Marvel, which is we're entitled

13   to be compensated for your exploitation of our characters, but

14   we don't have the agreement that Lee has with Marvel so it

15   would be a different type of complaint that we would have to

16   file.

17         THE COURT:  I'm not understanding your position

18   exactly.  So let me express my lack of understanding, and then

19   you can address it.

20         Lee had some sort of agreement with Marvel, and that

21   was what Judge Sweet adjudicated, correct?

22         MR. McGRATH:  That is correct.

23         THE COURT:  And, essentially, the SLMI is saying that

24   Lee never had the copyright interests he professed to have when

25   he engaged in the contract with Marvel.

 1           MR. McGRATH:  He sold the Brooklyn Bridge twice, yes.

 2           THE COURT:  Okay.  Are you essentially going to tell

 3   or argue to Judge Sweet that he ought to void the judgment?

 4           MR. McGRATH:  Yes.

 5           THE COURT:  And so if he's going to void the

 6   judgment, then it would seem that Marvel's interests have to be

 7   derivative of Stan Lee's interests and that's dependent upon

 8   how the SLMI/Stan Lee contract is adjudicated, correct?

 9           MR. McGRATH:  That is correct.  If I could --

10           THE COURT:  Just one moment.

11           MR. McGRATH:  Sure.

12           THE COURT:  So if Judge Sweet does not upset the

13   judgment under Rule 60(b), how, then, can you proceed, at least

14   with regard to the Marvel copyrights?  Of course you can appeal

15   his ruling if it's adverse to you and you feel you have an

16   appealable issue, but how else could you proceed?  How could

17   you proceed in this court, for example?

18           MR. McGRATH:  That's an excellent question, and Judge

19   Sweet actually answered that question at the conference we had

20   before him in October.  He was concerned that his decision did

21   not affect one way or the other SLMI's rights because what he

22   characterized his decision as was a decision in which he just

23   read a contract and figured out the numbers.  Stan Lee was

24   entitled to 10 percent; Marvel said that he was entitled to a

25   certain dollar amount; Stan Lee said, That's Hollywood

1  accounting.  I should be entitled to 10 percent of gross.

2  Judge Sweet looked at the issue, decided the issue, that

3  Hollywood accounting should not be applied, and that discrete

4  issue that was decided and then the subsequent settlement, that

5  could stand, and then we could still assert our rights of

6  ownership in which point Marvel could assert fraud claims

7  against Stan Lee.

8         So even though we've proceeded to appear before Judge

9  Sweet on behalf of the company out of an exercise of caution

10 and trying to make sense of this mess -- just like Your Honor

11 is doing -- we don't believe that if that judgment stands we

12 are necessarily barred from pursuing rights before this court

13 with regard to those characters.

14        THE COURT:  Isn't there something implicit in Judge

15 Sweet's judgment?  In other words, you're saying that all he

16 did was parse out certain percentages to each side based upon a

17 construction of the contract, and you're saying that there was

18 nothing before Judge Sweet or in his judgment which would

19 indicate that the agreement between Stan Lee and Marvel was

20 legitimate?

21        MR. McGRATH:  Well, Your Honor --

22        THE COURT:  The courts don't usually do that.  That

23 is sort of like an advisory opinion.  You know, in other words,

24 when Stan Lee and Marvel appeared before Judge Sweet, neither

25 side engaged in any argument about the contract other than the

```
1    percentages each was entitled to.
2            MR. McGRATH:  Your Honor, no, I don't want to give
3    that you impression.  As a matter of fact in our papers here
4    before you, we make very clear that Lee put in his complaint
5    and Judge Sweet, in going over Lee's allegations, made the
6    point that Lee has asserted that he made a conditional
7    assignment to Marvel which implicit in that would be that he
8    owned the characters that he could then assign, and our
9    adversary in their reply papers before you have said that that
10   is not accurate.
11           THE COURT:  What is the "adversary"?  Don't use
12   anything other than names.  There are too many names here.
13           MR. McGRATH:  Sorry, Your Honor.  Lee, QED and Pow!
14   both in the reply -- it was a joint reply -- they all said -- I
15   think the quote is, Judge Sweet found no such thing with regard
16   to the ownership issue in that matter.  So that's what they
17   have told you, Your Honor, that Lee did not -- Judge Sweet did
18   not implicitly find ownership.  I don't know if I --
19           THE COURT:  Why did they argue that?  It seems
20   contrary to their interest.
21           MR. McGRATH:  In the way that you've now
22   characterized everything today, perhaps, but our position is
23   that Lee did make that assertion and that that's the basis for
24   our assertion that anything that Judge Sweet did should be
25   voided because you didn't have all the facts.
```

```
 1          THE COURT:  But the immediate issue before the court
 2    is the question of the stay.
 3          MR. McGRATH:  Correct.
 4          THE COURT:  In other words, when I first reviewed the
 5    arguments, my instinct was that this is a case that calls for
 6    an early trial because it's a disgrace to any enlightened
 7    system of justice to have a case proceed like this has; and
 8    since at least I have some role in it, I thought that I ought
 9    to get to the heart of it and stop the procedural maneuverings.
10    But I stopped in my tracks with this Marvel situation, and now
11    that I hear that Marvel is such a central part of the case,
12    either historically or otherwise, an argument could be made
13    that there is some justification for a stay in order to
14    determine what Judge Sweet does.  Otherwise, let's just
15    project.  We'll go to trial next month in this case, and the
16    proper alignment is SLMI and Stan Lee in some permutation.
17          MR. McGRATH:  Versus each other.
18          THE COURT:  Stan Lee is Stan Lee, Stan Lee is QED,
19    Stan Lee is Pow!, right?
20          MR. McGRATH:  Right.
21          THE COURT:  SLMI is SLMI; SLMI is Abadin —— it's all
22    mumbo jumbo.  It's a dispute over that contract, and its
23    basically SLMI and Stan Lee, and the question is what does the
24    contract provide and did SLMI live up to its contract, which
25    would not have justified Stan Lee attempting to void it, and/or
```

1   was the contract voidable at the outset and what if anything --

2   this is getting even deeper -- but what the bankruptcy court

3   did is very vague to me, unclear.  The only thing that was

4   clear to me and the only aspect of the bankruptcy court that I

5   had to address was its agreeing to assign the copyright

6   interests to SLC.  That didn't happen.  It went to QED.

7         But how the bankruptcy court intended to preserve the

8   litigation between the parties is unclear.  In other words,

9   when the transfer was made out of bankruptcy, the bankruptcy

10  court seemed to have some sense that some entity ought to be in

11  a position to protect the copyright and develop it for the

12  interests of the stay or the parties.

13        But what is your understanding as to the effect, if

14  any, of the bankruptcy in terms of the respective rights

15  between the parties, Stan Lee and SLMI?

16        MR. McGRATH:  Your Honor, I think the bankruptcy

17  again, unfortunately, was a mess -- one quick point is that

18  SLMI would be prepared to have a trial on the issues you

19  identified next month and -- but now to answer your bankruptcy

20  question.

21        THE COURT:  Yes.

22        MR. McGRATH:  In the bankruptcy, the debtor in

23  possession generally speaking would drive a bankruptcy and

24  would be responsible for the --

25        THE COURT:  That would be SLMI.

1          MR. McGRATH:  Right.  SLMI was under the control of

2     Lee.  Today, SLMI is adverse to Lee.  Lee and other folks

3     basically gamed the system, and that's based upon our

4     investigation and our reading of what --

5          THE COURT:  You're not answering my question.  The

6     question I have is what -- how did the respective copyright

7     interests of SLMI and Stan Lee survive the bankruptcy?  Usually

8     when a bankruptcy is over, you know, that's it, and so it

9     appears as though SLMI is saying, as is Stan Lee, that the

10    bankruptcy court didn't end the dispute.

11         MR. McGRATH:  That's correct, Your Honor.

12         THE COURT:  Both sides seem to be in agreement in

13    that regard because they're both debating the same issue from

14    different ends.

15         MR. McGRATH:  Yes.

16         THE COURT:  But when a bankruptcy ends, there's some

17    finality to it.  How did this litigation survive the

18    bankruptcy?

19         MR. McGRATH:  In the best of all possible worlds,

20    there is an end after bankruptcy, but not when the bankruptcy

21    is used as a method to extract certain valuable assets from a

22    company and then leave the company adrift without management

23    for many years until the U.S. trustee on a motion to the

24    bankruptcy court asks for the case to be dismissed with -- and

25    don't quote me on this -- but for lack of prosecution of the

```
 1    bankruptcy.  That's the situation here.

 2          THE COURT:  But the case was dismissed, and this is a

 3    question that I asked when I first got the case.  Some of these

 4    issues are derivative of things the bankruptcy court should or

 5    shouldn't have done.

 6          MR. McGRATH:  But it was never put before the

 7    bankruptcy court.

 8          THE COURT:  I know, but are these matters that --

 9    just like your going to Judge Sweet in New York -- are these

10    matters that you ought to address to the bankruptcy court?

11          MR. McGRATH:  Potentially, Your Honor, but because

12    the bankruptcy court was the -- dismissed the action and

13    because certain critical aspects of the assets in SLMI's

14    possession weren't even put on the bankruptcy filings, the

15    court only found out about certain disputes like the

16    termination of the agreement.

17          THE COURT:  What court?

18          MR. McGRATH:  The bankruptcy court, excuse me.  The

19    bankruptcy court only found out about the certain issues like

20    the termination issue --

21          THE COURT:  But it knew about the termination --

22    about the dispute because it agreed to have it assigned to SLC,

23    which never happened.  So the bankruptcy court was aware of

24    this, and that assignment is confusing to me because was the

25    assignment, in a sense here's an assignment of these copyright
```

```
 1    interests to SLC, or here is a temporary assignment to SLC

 2    pending the parties starting up their dispute some other time?

 3              You seem to be arguing the latter.

 4              MR. McGRATH:  Right, I'm arguing -- actually, I would

 5    argue both points.  The first issue it is mooted by the fact

 6    that there was a voided transaction, and the transaction didn't

 7    happen; then the second point would be that it would have been

 8    an assignment --

 9              THE COURT:  But that would seem to contradict what

10    the bankruptcy court did because the bankruptcy court made an

11    assignment.  When the bankruptcy court made the assignment, the

12    assignment had to be with the bankruptcy court's view that

13    there was something to assign, not something that was not

14    assignable.

15              MR. McGRATH:  On that point, I agree with Your Honor,

16    the bankruptcy court, implicit in Lee's coming to the

17    bankruptcy court and saying, We have assets that we want to

18    take out of the estate and the bankruptcy court putting its

19    imprimatur on the assignment, that demonstrates that in the

20    bankruptcy, everyone was aware that SLMI's estate -- the SLMI

21    estate owned those characters.  I think that much is clear.

22    But what happened next is where the mess ensues and where the

23    confusion ensues.

24              THE COURT:  I mean it seems like the --

25    notwithstanding the dispute, the seminal dispute as to who has
```

```
 1    the rights between SLMI and Stan Lee, it seems like with all
 2    these entities out there, the rights are floating somewhere.
 3    In other words, they haven't landed somehow, and what about
 4    SLC?  That was the entity to whom the rights were to have been
 5    assigned and they never were, correct?
 6              MR. McGRATH:  They never showed up to the party and
 7    instead they were assigned to QED and through QED --
 8              THE COURT:  Your position is all of these entities --
 9    QED, Pow!, SLC -- it's all Stan Lee.
10              MR. McGRATH:  It's all Lee.
11              And so in -- I don't want to contradict the court,
12    but these rights aren't floating around.  They floated right
13    into Stan Lee's pocket, and that is not where they belong.
14              THE COURT:  Well, I don't know whether that is right
15    or wrong.  All I'm -- I have no idea.  For all I know, Stan
16    Lee's position is entirely correct, or yours is correct.  I
17    don't know.  I haven't even read the agreement.  I don't know
18    what it's about from an interpretive standpoint or what the
19    extrinsic evidence, if any, so I'm not even close to the
20    merits.
21              MR. McGRATH:  Correct --
22              THE COURT:  I mean your position is that Stan Lee is
23    one big crook and that he's essentially maneuvered the
24    bankruptcy and everything else to hurt the shareholders of SLMI
25    for his own benefit.  That's all well and good, but in order to
```

```
1    have a trial on that, we have to figure out where things are,

2    given these complicating factors.  I'm not trying to make it

3    any more complicated than it is.  In other words, I'm not

4    layering this any more than what I've said.  It is exactly as

5    I've described, and so let's turn back to Marvel again.

6              Let's say that Judge Sweet doesn't allow the judgment

7    to reopen or doesn't -- what's the word -- void the judgment

8    or --

9              MR. McGRATH:  Doesn't reopen or void the judgment.

10             THE COURT:  So I mean there may be some pieces of the

11   copyright interests that are not part of the Marvel mix, but

12   leaving that aside, what would your next move be?

13             MR. McGRATH:  We would proceed the same way, and let

14   me tell you why.

15             THE COURT:  What do you mean "the same way"?

16             MR. McGRATH:  We would proceed before Your Honor and

17   we would assert ownership interest in the Marvel characters

18   because we would assert that there's no preclusive effect of

19   that judgment upon SLMI.

20             THE COURT:  Wait a second.  That's a good point.

21   Let's say you did that, and then -- this gets to a point that I

22   want you to address directly.

23             So then we have Judge Sweet with a judgment as to the

24   respective rights between Marvel and Stan Lee, and then let's

25   just fast forward and you prevail before a jury here, and the
```

1    jury says the contract wasn't voidable, SLMI lived up to the

2    contract with Stan Lee; Stan Lee has no interest in the

3    copyrights that were assigned to SLMI.

4              Then how do those two judgments --

5              MR. McGRATH:  Live happily together?

6              THE COURT:  In effect.

7              MR. McGRATH:  The answer is because in --

8    unfortunately, in our society, this happens all the time:

9    People infringe copyrights.  People say, I am the owner of a

10   copyright, and then they engage in licensing, and they license

11   to third parties who believe that they are dealing with the

12   owner when, in fact, they're not.  There may be a dispute

13   between the alleged owner and this third party, and they

14   resolve that dispute at a trial or through a settlement, and

15   that settlement is approved by a federal or state court.  That

16   does happen all the time; this is not unique situation.

17             But then the true owner shows up and says, Hold on

18   now.  I'm bringing an action to settle once and for all the

19   ownership issue here.  You've been licensing my product, and

20   you don't that.  And there's a trial, and in that trial, the

21   true owner succeeds and is successful --

22             THE COURT:  What you say makes sense to me because

23   there has been no adjudication on the merits of the copyright

24   dispute.

25             MR. McGRATH:  That's correct.

```
 1              THE COURT:  I mean you could argue -- hasn't been.

 2              MR. McGRATH:  Right.  It was an assumption --

 3              THE COURT:  And certainly the judgment in Judge

 4   Sweet's court would have no collateral estoppel on SLMI because

 5   they weren't a party to that litigation.

 6              MR. McGRATH:  That is correct.  And so a nondisputed

 7   fact between Lee and Marvel that there was ownership to be

 8   transferred cannot act as collateral estoppel against SLMI.

 9              THE COURT:  So then why are you seeking a stay

10   pending your motion to intervene?

11              MR. McGRATH:  Your Honor, we're not seeking a stay.

12   We want to proceed before you as soon as possible.

13              THE COURT:  I see.

14              If the trial were to go forward, how would you be

15   presenting -- obviously, there are probably just a few

16   protagonists, no matter how complex this web.  Like most of

17   these cases, there probably is some correspondence and some

18   face-to-face meetings about what was assigned and in its terms

19   and so forth.

20              Is there a document that professes to be an

21   all-inclusive document?

22              MR. McGRATH:  A contract, yes.  Yes, there is.

23              THE COURT:  Does the contract -- is it written in an

24   all-inclusive way?

25              MR. McGRATH:  Yes.  It's more or less a quit-claim
```

 1    type arrangement.  Lee transfers all of his rights and

 2    interests to any intellectual property and other rights to SLMI

 3    from the past and into the future, and it's effective in

 4    October 1998.  It's signed in October 1998.  SLMI, the company,

 5    the public company, puts it in its SEC filings so there -- and

 6    Lee signs off on the SEC's filings.  So the point, yes, we have

 7    the contract.

 8            THE COURT:  So your position is that the dispute

 9    would be more about whether the parties complied with the

10    contract.

11            MR. McGRATH:  Our point is that the assignment was

12    not contingent on the other aspects, the more employment-based

13    aspects of the contract.

14            THE CLERK:  So in other words, the assignment, from

15    your standpoint, was such that SLMI didn't have to meet my

16    criteria to keep its assigned interest?

17            MR. McGRATH:  Correct, nonexecutory contract.

18            THE COURT:  But Stan Lee has a different view of it.

19            MR. McGRATH:  Apparently, yes.

20            THE COURT:  And Stan Lee's view of it is that there

21    were some matters that SLMI had to perform that it didn't, and

22    those allowed him to void the contract or for some reason the

23    contract was voidable for some reason from the outset, correct?

24            MR. McGRATH:  Right, that's what they would say.

25            THE COURT:  I see.

```
 1              In terms of the alignment of the parties, how would
 2    the case now be aligned?  In other words, what would the
 3    caption of the case be?
 4              MR. McGRATH:  I think subject to other people's
 5    thoughts, it would be -- SLMI versus Stan Lee is the big
 6    headline, and there may be some other entities falling under
 7    those big headlines, but that would be basically it.
 8              THE COURT:  What would the other entities be?
 9              MR. McGRATH:  QED and Pow! on the Lee side and,
10    arguably, but I don't think it would be necessary, SLMI
11    Delaware, which is a wholly owned subsidiary of SLMI Colorado.
12              THE COURT:  Why would there have to be more parties
13    than just Stan Lee?  Because Stan Lee assigned his interests to
14    those other entities?
15              MR. McGRATH:  Yes, they're the ones actively
16    exploiting the entities.  So if we wanted injunctive relief, we
17    would be seeking it against those entities.
18              THE COURT:  Is that alignment in place now?
19              MR. McGRATH:  No.  It is not currently in place,
20    number one, because SLMI is new to this litigation because they
21    were dormant for many years.
22              THE COURT:  What case would this alignment -- in
23    other words, there is a case before Stan Lee Media, Inc., SLMI,
24    against Stan Lee.
25              MR. McGRATH:  Yes, Your Honor.
```

```
 1              THE COURT:  Why can't that case proceed?

 2              MR. McGRATH:  That case could proceed, and then we

 3  would just be recognized as the duly authorized representatives

 4  of SLMI.  The one caveat to that is the QED case is actually

 5  the case that's first in time, and earlier on, the --

 6              THE COURT:  Why does that make a difference?

 7              MR. McGRATH:  I was just going you suggest that they

 8  could all be consolidated.

 9              THE COURT:  Well, it would seem to me that the most

10  sensible consolidation would just be Stan Lee Media, Inc.

11  against Stan Lee, QED and Pow!, or maybe are there any --

12              MR. McGRATH:  Your Honor, that would suit our

13  purposes.

14              THE COURT:  But that would require some realignment

15  of the QED case versus Nesfield, correct?

16              MR. McGRATH:  Yes, Your Honor, and that was my point.

17  There may need to be consolidated amended complaints or

18  cross-complaints.

19              THE COURT:  Is Pow! a part of any of these cases?

20              MR. McGRATH:  Yes, in the QED matter, Pow!, like QED,

21  was aligned with Stan Lee.

22              THE COURT:  I see.  Let me hear from the Stan Lee

23  side of it.  Who speaks for Stan Lee?

24              You can begin, if you wish, with why the stay pending

25  Judge Sweet's ruling on the motion to intervene.
```

```
 1              MS. HERONIMUS:  Thank you, Your Honor.  Marcy
 2   Heronimus on behalf of Stan Lee, QED and Pow!.
 3              If I may, Your Honor, I just wanted to address a
 4   couple of the issues that you raised with the defendant --
 5              THE COURT:  No, just address the issue I asked you to
 6   address.
 7              MS. HERONIMUS:  Why the motion to stay should --
 8              THE COURT:  In other words, why are you seeking a
 9   stay pending the decision by Judge Sweet in the Stan Lee/Marvel
10   case in the Southern District of New York?
11              MS. HERONIMUS:  Right.  Your Honor, the reason we're
12   seeking the stay until the decision has been made by Judge
13   Sweet is, quite frankly, SLMI is forum shopping; and as Your
14   Honor aptly pointed out, this case is a wreckage.  Part of the
15   reason it's a wreckage is there are so many cases proceeding in
16   so many different courts, and that was done by SLMI and Abadin
17   and these other derivative plaintiffs.
18              Right now, the issue before Judge Sweet -- or one of
19   the issues before Judge Sweet -- is the res judicata effect of
20   Judge Crotty's ruling, and Judge Crotty's ruling decides the
21   merits of these cases here.
22              THE COURT:  How can that be?  I mean Judge Crotty --
23   and I'm not suggesting how he will rule or should rule -- but
24   in the Judge Crotty case, what he did was dismiss a derivative
25   plaintiff on behalf of SLMI on the ground that plaintiff, who
```

```
1  was representing the corporation, didn't own stock at the time

2  of the operative events of the complaint.

3              What was the name of the plaintiff?

4              MS. HERONIMUS:  Abadin.

5              THE COURT:  Abadin.  He dismissed the derivative

6  action on procedural grounds to the -- why would he have to

7  make any findings on the merits?

8              MS. HERONIMUS:  Your Honor, because there's a

9  difference between statutory standing and constitutional

10 standing.  So what he found was that Abadin didn't own stock at

11 the time of the events, and that's a statutory standing

12 requirement, in which case he can also then go forward and

13 decide merit-based decisions, as well, which is exactly what he

14 did.

15             THE COURT:  So you're saying that Judge Crotty

16 actually made findings.

17             MS. HERONIMUS:  He did, Your Honor, based on statute

18 of limitations, laches, estoppel and other grounds.

19             THE COURT:  But the representative, then, Abadin, was

20 not qualified to speak on behalf of -- or to file a lawsuit on

21 behalf of SLMI, correct?

22             MS. HERONIMUS:  Correct, only because he didn't own

23 stock at the time.

24             THE COURT:  Right.  And so your position, then, is

25 that assuming that there is a res judicata effect to what he
```

1    did against another plaintiff, that all those laches, estoppel

2    grounds, would be equally applicable to another person.  In

3    other words --

4                MS. HERONIMUS:  And the corporation, Your Honor.

5                THE COURT:  Be seated.  I want to get back to you.

6                But I never asked you about that.  I didn't focus

7    fully on the other parts of what Ms. Heronimus just said.  In

8    other words, even though it's termed a merits type of decision,

9    it's sort of more equitable in nature, isn't it?  I mean if

10   you're talking about estoppel and laches and things like that,

11   correct?

12               MR. McGRATH:  That is correct.

13               THE COURT:  So give me your view of that -- of Judge

14   Crotty's decision.

15               MR. McGRATH:  Judge Crotty --

16               THE COURT:  Judge Crotty never made any decision on

17   the real merits of the case, the real merits of the case being

18   who has the copyright interest by virtue of the Lee/SLMI

19   contract; but the plaintiff is arguing that since -- even

20   though Abadin was not a qualified representative in the

21   derivative action under some legal argument of statutory versus

22   constitutional standing, a court can make findings because

23   there was a statutory standing type of analysis, and that those

24   findings -- was Abadin represented in the case in New York?

25               MR. McGRATH:  Yes.  By the way, it was not just

1    Abadin.  There were numerous named plaintiffs, and they were

2    represented by Martin Garbus, who is not representing the

3    company.  We represent the company, not the derivative

4    plaintiffs.  I think it's important to note that this idea of

5    Rule 23.1 standing and whether or not that rises to the level

6    of Article III standing is -- there's a distinction without a

7    difference here.  The truth of the matter is --

8            THE COURT:  Just one second.  I can't decide these

9    things on the fly.  So the details are not helpful to me now.

10           What I want to know is where does that decision by

11   Judge Crotty stand now?  Is that being appealed?

12           MR. McGRATH:  It's final.

13           THE COURT:  It hasn't been appealed?

14           MR. McGRATH:  The SLMI company sought leave to

15   intervene and file an appeal.  That was denied by the Second

16   Circuit, so the company could not appeal.  Jose Abadin and the

17   other derivative plaintiffs began to appeal.  Jose Abadin is

18   now director of the company and the other derivative plaintiffs

19   did not pursue the appeal.

20           THE COURT:  So if I directed the litigation to go

21   forward in this court, the first thing that the court would

22   confront would obviously be a motion by the Stan Lee faction or

23   factions to dismiss on res judicata, correct?

24           MR. McGRATH:  After there was an answer, and, yes,

25   after everything was consolidated and appropriately set forth,

```
 1    likely they would bring that motion, and that motion would
 2    fail.
 3              THE COURT:  Well, I don't know if it would or not.
 4    You're telling me that it would.  I have no basis for saying
 5    one way or another; I don't know.
 6              MR. McGRATH:  I'm prepared to give you a basis --
 7              THE COURT:  Like I said, I can't decide these kinds
 8    of things without reading cases and being prepared.  So there's
 9    no point in arguing that right now.  I'm not that smart to pick
10    up on it in a flash.
11              So all I'm trying do is line up what is going to
12    happen, and it seems to me that's what is going to happen.  So
13    these are --
14              I'm not cutting you short, Ms. Heronimus -- do I say
15    your name correctly?
16              MS. HERONIMUS:  Heronimus.
17              THE COURT:  -- but I understand your position.
18              So these are my inclinations:  I would -- you may sit
19    down -- I'm inclined -- I want to give it a little more
20    thought -- but I'm inclined to deny the motion to stay in the
21    Judge Sweet case; I would be inclined to get this case moving
22    so we can get to the substantive issues with the full
23    expectation that the first matter the court would face would be
24    a motion from Stan Lee, which would be an important motion on
25    the res judicata effect of Judge Crotty's ruling; and the fact
```

1  that the Second Circuit has ruled as counsel has advised

2  indicates that that matter is unlikely to proceed any further

3  from an appellate standpoint.

4        And so let me ask you this, Ms. Heronimus:  How

5  should the case be aligned, from your standpoint?  In other

6  words, my view is let's move to simplicity.  This is --

7  understanding you're going to make a motion to derail the whole

8  thing and you may be successful, but I'm just talking about

9  aligning it.  My feeling is the best way to do it is to have

10  SLMI against Stan Lee, QED and Pow!.

11        Is that palatable to you?

12        MS. HERONIMUS:  I believe with some additional

13  parties, that would be the correct alignment.

14        THE COURT:  Who would the other parties be?

15        MS. HERONIMUS:  The additional parties would be the

16  defendants that QED and Pow! and Lee have named in the first

17  primary case, which is 225; so Nesfield, Galloway and the

18  others that are --

19        THE COURT:  Is that satisfactory to you?

20        MR. McGRATH:  Your Honor, we can't speak for them

21  because they're not officers -- if they want to have them in

22  the case, that's fine.

23        THE COURT:  I am going to order the case realigned in

24  that way.  That will be the new caption of the case.  And as

25  Ms. Heronimus just outlined and -- is the next step

```
 1   procedurally for Stan Lee, QED, Pow!, Nesfield, Galloway and

 2   somebody I missed along the way, do they have to answer?  Is

 3   that the idea?  Has there been an answer filed yet?

 4              MS. HERONIMUS:  There has not, Your Honor.  There

 5   were motions to dismiss or motions for summary judgment, part

 6   of which were ruled upon.  The problem is --

 7              THE COURT:  How would you answer now -- would you be

 8   able to answer by moving on res judicata, moving to dismiss on

 9   res judicata?

10              MS. HERONIMUS:  Yes, Your Honor, but the problem with

11   that is that exact same issue is already pending before Judge

12   Sweet.  So if we go ahead and --

13              THE COURT:  What issue?

14              MS. HERONIMUS:  The res judicata effect of Judge

15   Crotty's decision.  That's the exact issue that is pending

16   before Judge Sweet right now.  That's been briefed, argued and

17   is just awaiting decision from Judge Sweet.  That's the primary

18   reason we're asking for the stay right here, Your Honor, is to

19   allow Judge Sweet to make that determination rather than having

20   two federal district courts --

21              THE COURT:  Why is the Judge Crotty decision before

22   Judge Sweet?

23              MS. HERONIMUS:  Because some of the issues that may

24   have to be addressed, or that have been raised before Judge

25   Sweet by SLMI, have already been addressed and ordered to final
```

*UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA*
*COURT REPORTER DEBORAH K. GACKLE*

```
 1    judgment by Judge Crotty.

 2          THE COURT:  Let me hear your response on that.  You

 3    made a little progress here, but every step has a half-step

 4    retreat.

 5          MR. McGRATH:  Yes, Your Honor.  The issue that

 6    Ms. Heronimus raised is -- we would disagree.  We --

 7          THE COURT:  Don't speak in conclusory terms.  I mean

 8    Ms. Heronimus was very clear.  She said that this very issue of

 9    the res judicata effect of Judge Crotty's decision is briefed

10    and pending before Judge Sweet.  So she says why shouldn't we

11    stay it?  And what is your answer?

12          MR. McGRATH:  The answer is it is a small, not

13    necessary part of the opposition to our motions in which Lee

14    and Marvel raised the res judicata.  Our reply brief before

15    Judge Sweet spent one paragraph on that issue saying that

16    there's no reason why the court should look to the Judge Crotty

17    decision at all.

18          THE COURT:  But the way you responded to motions is

19    not the issue, the issue is would a decision by Judge Sweet on

20    a matter that supposedly is briefed and ready for decision be

21    binding on this court?

22          You're before Judge Sweet, aren't you?

23          MR. McGRATH:  Yes, Your Honor.

24          THE COURT:  Why wouldn't it have a collateral

25    estoppel effect?
```

1          MR. McGRATH:  Your Honor, if he ruled on our motion

2     to unseal -- which is the first motion -- it would not bind

3     this court with regard to res judicata because that issue was

4     not -- had nothing to do with res judicata.  On the second

5     motion, which is, I think, the point that you want me to make,

6     we moved under Rule 60(b), and it is highly probable -- and

7     that's the best I can do for Your Honor -- that the judge could

8     rule on the Rule 60(b)(4) issue, the Rule 60(b)(5) issue and

9     the Rule 60(b)(6) issue without addressing the res judicata

10    issue --

11         THE COURT:  But what if he does, and it's before him,

12    why wouldn't that be determinative?

13         MR. McGRATH:  This is -- it's hard for me to answer

14    that question, Your Honor, because it's res judicata of what?

15    Res judicata against whom?  If it's res judicata against Jose

16    Abadin as a derivative plaintiff or another derivative

17    plaintiff bringing the exact same claim that was brought before

18    Judge Crotty, yes, maybe that would be dispositive, but that is

19    not what is happening before Your Honor.  This is why this res

20    judicata issue is a red herring.

21         THE COURT:  What is the distinction between those

22    matters and this case before me?

23         MR. McGRATH:  Because before you, the company has

24    appeared and moved to pursue -- realign itself as plaintiff and

25    pursue the claims brought derivatively on its behalf.

1        THE COURT:  So you're saying that the case before me

2   is not a derivative suit?

3        MR. McGRATH:  It will not be as soon as we are

4   allowed to answer.  That is another issue, is that SLMI has

5   never answered in any of these matters.  SLMI has not been

6   properly recognized as plaintiff in any of these matters.

7        THE COURT:  If you're a plaintiff, why are you

8   answering?

9        MR. McGRATH:  Because we're actually a named

10  defendant in the lowest case number, Your Honor.

11       THE COURT:  But the realignment would now be SLMI as

12  plaintiff.

13       MR. McGRATH:  Right.

14       THE COURT:  Against these other defendants.

15       MR. McGRATH:  So we would have to issue a complaint

16  in that case.  We don't have -- SLMI has never formally filed a

17  complaint in any of these matters because SLMI is new on the

18  scene.  It's one of the --

19       THE COURT:  Then I'm going to do this, as a minimum:

20  I'll give SLMI 20 days to file a complaint, and that's the only

21  ruling I'm going to make now.  I'm going to consider what the

22  parties have said, try and digest it, and if necessary issue an

23  order requiring some further explanation.  But that's as far as

24  I can go.  This is just a real tangle, and as I said at the

25  outset, I'm not pointing any fingers, but it certainly could in

```
 1   and of itself and nothing more be the subject of a federal

 2   civil procedure course in law school.

 3              MR. McGRATH:  Thank you.

 4              MS. HERONIMUS:  Thank you, Your Honor.

 5              (Proceedings concluded at 2:52 p.m.)

 6                        - - - - -

 7

 8

 9

10

11                    C E R T I F I C A T E

12

13         I hereby certify that the foregoing is a true and

14   correct transcript from the stenographic record of

15   the proceedings in the foregoing matter.

16

17                                     January 26, 2011

18   /s/_____     _____

19       Deborah K. Gackle                       Date
         Official Court Reporter
20       CSR No. 7106

21

22

23

24

25
```